OIL COUNTRY SPECIALISTS, LTD., Appellant,

v.

PHILIPP BROTHERS, INC., Appellee.

No. 01–87–00109–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 29, 1988.

Rehearing Denied Dec. 8, 1988.

William E. Junell, Kay J. Hazelwood, Andrews & Kurth, Houston, for appellant.

Stephen D. Susman, Parker C. Folse, III, Susman, Godfrey & McGowan, Houston, for appellee.

Before EVANS, C.J., and COLEMAN,* C.J. (Retired), and PEDEN,* J. (Retired).

## OPINION

PEDEN, Justice (Retired).

Philipp Bros., Inc. (Phibro) consigned most of its oil well pipe inventory to Oil Country Specialists, Ltd. (OCS), by written contract, giving OCS the exclusive right to sell it.

OCS sued Phibro for breach of the contractual warranties as to quality, for fraudulent inducement, and for negligent misrepresentations.

Phibro counter-claimed for breach of contract and for bad faith termination, and alleged that OCS had failed to perform its contractual obligations to pay consignment and restocking fees.

After receiving jury findings, the trial court signed a judgment for Phibro on its counter-claim. Those findings included a) that Phibro induced OCS to enter the contract by negligently representing the quality of the pipe but that OCS was estopped from complaining about such misrepresentations and b) that OCS had acted in bad faith when it rejected the entire Phibro inventory.

In this appeal OCS has divided its 51 points of error into eight groups that attack, among other things, the jury findings just listed; OCS also complains about the trial court's award to Phibro of damages, attorneys' fees and pre-judgment interest, failure to award damages to OCS, and the

* Assigned to this case by the Chief Justice of the Supreme Court pursuant to Tex.Gov't Code Ann.

court's rulings on certain evidentiary matters and on the charge.

The parties' contract, dated May 29, 1985, covered both threaded and unthreaded pipe. Phibro warranted that the inventory would meet API (American Petroleum Institute) specifications, would be of merchantable quality, and would pass without objection in the trade. For its part, OCS agreed to pay Phibro (1) a set price for any goods sold out of Phibro's inventory at the time of sale, (2) a monthly consignment fee (to be paid regardless of actual sales) equal to a percentage of the contract sales price of all unsold goods remaining in inventory at the end of each month, and (3) an inventory restocking fee equal to 10% of the aggregate purchase price of all items remaining in inventory at the "termination" of the agreement by OCS or upon termination by Phibro in the event of a default by OCS.

The May 29 contract also gave OCS the right to reject any material which failed to comply with API specifications as determined by third-party inspections but gave OCS no right to reject material whose nonconforming status was due to deterioration from atmospheric conditions unless the rejection was made within 90 days from May 29 for material stored on third-party yards, or within 15 days from May 29 for material stored at the OCS yard.

Three weeks later, in a June 19, 1985 letter agreement, OCS stated that it had examined a substantial part of the inventory and had determined that part of the inventory of threaded pipe "may not" meet API specifications so it "may not" pass without objection in the trade as warranted under the agreement of May 29. This letter agreement included several renegotiations of threaded-pipe provisions in the earlier contract:

1. the calculation of the consignment fee was changed to require OCS to pay such fee only on merchantable threaded inventory,

§ 74.003 (Vernon 1988).

2. the restocking fee was changed by reducing the purchase price of pipe in threaded inventory,

3. OCS agreed to allow Phibro to sell the threaded pipe without prior consent from OCS,

4. OCS agreed to sell merchantable threaded pipe before selling plain-end pipe, and

5. the 90-day limit for rejecting threaded pipe was withdrawn.

Phibro's obligations under the consignment agreement were expressly conditioned upon the funding by OCS of a letter of credit equal to 10% of the aggregate purchase price of the inventory under consignment. At the time of the agreement, the aggregate purchase price of the consigned inventory equaled approximately $15 million. On June 20, 1985, a Texas Commerce Bank issued a letter of credit in the amount of $1,516,000 in favor of Phibro at the request of, and for the account of, OCS. The terms of the letter of credit required the bank to honor the letter for payment if Phibro presented it with a signed statement that OCS had failed to pay the restocking fee and an invoice for the amount of the restocking fee marked "unpaid."

In its pleadings OCS alleged that it had inspected the goods in the inventory and determined that Phibro had breached warranties regarding their condition. Claiming that the condition of the inventory substantially impaired the value of the contract as a whole, OCS "rejected" the entire inventory on August 15, 1985, and "cancelled" the contract. OCS further asserted that it had been induced to enter into the agreement by Phibro's fraudulent or negligent misrepresentations, and sought to avoid the presentment of the letter of credit.

Phibro claimed that OCS had terminated the contract wrongfully and in bad faith, alleging that the real motivation for the termination by OCS was that after the effective date of the contract, market prices for pipe fell sharply and OCS no longer viewed the consignment agreement as a favorable business venture. Further, Phibro asserted that the consignment agreement allowed OCS the right to reject nonconforming items within the inventory but not to unilaterally "cancel" the agreement. Phibro alleged that the unambiguous meaning of the contract was that any purported cancellation could only amount to a "termination" by OCS, requiring the payment of the restocking fee. In the alternative, Phibro said that OCS's bad faith rejection of the entire inventory precluded "cancellation" under Sec. 2.711 Tex.Bus. & Comm. Code and amounted to a default by OCS, enabling Phibro to terminate the agreement and require the payment of the restocking fee.

When Phibro attempted to draw down the $1.5 million letter of credit in collection of the contractual restocking fee, OCS sought injunctive relief.

After a preliminary hearing, the trial court temporarily enjoined the presentment of the letter of credit and this court affirmed. *Philipp Bros., Inc. v. Oil Country Specialists, Ltd.*, 709 S.W.2d 262 (Tex. App.—Houston [1st Division] 1986, writ dism'd w.o.j.).

When the instant case was tried on its merits, the jury made the following findings in answer to special issues:

1. the jury did not find that Phibro had fraudulently induced OCS to enter into the contract (by making any of six named alleged misrepresentations).

2. Phibro induced OCS to enter into the contract by negligently representing that the Phibro inventory would meet API specifications, that it would pass without objections in the trade, and that the threaded portion of it could be sold on a "load and go" basis.

3. (a predicated issue) OCS is estopped from complaining about Phibro's representations about the condition of the inventory by OCS's having represented in the June 19 letter that OCS had examined a substantial part of the Phibro inventory and had determined that the threaded inventory might not meet API specifications and might not pass without objections in the trade.

4. (an issue predicated on an affirmative answer to any part of Issue 1 or 2)

OCS waived any right to complain that it was fraudulently induced to enter into the contract.

5. Phibro failed to perform its obligations under the contract by failing to provide inventory which met API specifications.

6. (a predicated issue) Phibro's failure to perform its contractual obligations substantially impaired the value of the contract as a whole to OCS.

6a. (a predicated issue) the jury did not find that Phibro's failure to perform its contractual obligations was a proximate cause of any damages to OCS.

7. (a predicated issue) OCS acted in bad faith when it rejected the entire Phibro inventory on August 15, 1985.

8. (a predicated issue) OCS is estopped from complaining about Phibro's failure to perform its obligations under the contract by OCS's representing in the June 19 letter amendment that OCS had examined a substantial part of the inventory and had determined that the threaded inventory might not meet API specifications and might not pass without objection in the trade.

9. (a predicated issue) the jury did not find that OCS waived any right to complain about Phibro's failure, if any, to perform its obligations under the contract.

10. the amount of the restocking fee as of August 15, 1985 was $114,932.73.

11. the compensation due Phibro for OCS's failure to pay the consignment fee from August 1 to August 15, 1985 was $43,659.71.

The trial court disregarded the jury's answer to Issue No. 10 and entered judgment in favor of Phibro for $1,369,993.00 (court's determination of the amount of the restocking fee), also for $43,649.71 ($10.00 less than jury's determination of the amount of the consignment fee), and $450,-000.00 in attorneys' fees. In addition, the trial court lifted the injunction against the presentment of the letter of credit and later amended the judgment against OCS to include $95,876.18 in pre-judgment interest.

OCS first argues that as a matter of law the statements in the letter agreement could not estop it from complaining about the breach of warranty (Issue 8).

Phibro asserts that it was led to believe that because OCS had inspected a substantial portion of the entire inventory but was complaining only about the threaded pipe, it had found the plain end pipe acceptable. Also, Phibro alleges that it was led to believe that OCS's complaints about the threaded inventory would be solved by amending the contract according to the terms of the June 19 letter agreement.

We note, however, that the letter agreement contained no statements regarding the condition of the plain-end pipe or about the effect of the letter agreement on the warranty provisions of the May 29 contract.

Estoppel is an equitable remedy fashioned to prevent injustice. The essence of estoppel is that a party who causes another to reasonably and detrimentally rely upon his representations will be prevented from denying the facts represented or promises implied by the representations. There are limits to the application of the equitable remedy of estoppel, and courts are mindful of the rules of law and reason in its application. *See, James Baird Co. v. Gimbel Bros., Inc.* 64 F.2d 344 (2nd Cir.1933) (L. Hand, J.) (reasonable objective intent of promissor may determine not only existence of contract but issues of estoppel).

Here, the theory for estopping OCS from complaining about Phibro's breach of warranty is the allegedly implied promise by OCS that it would agree to forego the contractual warranty covering both threaded and plain end pipe if Phibro agreed to the letter agreement's amendments of the contract granting additional value and price concessions relative to the threaded inventory.

The letter agreement expressly states that it is purely amendatory and supplemental of the May 29th contract. While it contains a long list of the specific paragraphs and provisions of the May 29th contract subject to amendment and supplementation, it contains no reference to any

agreement to amend or supplement the warranty provisions.

OCS was under no duty to relinquish its right to rely upon the warranty, and there is no evidence to indicate that OCS intended to give up the warranty in return for the concessions made by Phibro in the letter agreement. Further, considering only the evidence, and reasonable inferences therefrom, favoring the finding of estoppel and disregarding the evidence and inferences therefrom to the contrary, we find no evidence that OCS knew .or should have known that Phibro was relying upon such a false impression in signing the letter agreement. *See, King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985).

■ Here, no material breach was shown to have occurred at the time the letter agreement amending the May 29 contract was signed. There was nothing about the circumstances to indicate that either OCS or Phibro intended the letter agreement to affect the warranty provisions or other unstated contractual rights. The jury finding (in Issue 8) that OCS was estopped from complaining about Phibro's breach of warranty was therefore erroneous as a matter of law.

Phibro's estoppel argument regarding its own misrepresentations is that because OCS claimed to have inspected the inventory and then expressly acknowledged the potentially deficient condition of the threaded inventory in amending the agreement, it should be prevented from complaining that it was induced to enter the same agreement without knowledge of the inventory's condition (Issue 3).

OCS argues that as a matter of law the tentative statements in the June 19 letter agreement cannot estop it from complaining about Phibro's negligent misrepresentations which induced it to enter it into the contract.

We agree with OCS that the statements that the threaded inventory *might not* comply with API specifications, and *might not* pass without objection in the trade, were nothing more than statements of opinion, judgment, probability, or expectation, restricted to the threaded inventory. As

such, they are insufficient to form the basis of an estoppel based on misrepresentations of fact. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983); *Jeffcoat v. Phillips*, 534 S.W.2d 168, 171 (Tex.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Indeed, both parties thought that the statements about the condition of the threaded inventory might not prove to be true and they amended the agreement to provide for an interest fee on merchantable threaded pipe in case of that possibility.

We hold that since the jury's estoppel findings depended not only on a misrepresentation of inspection but also upon mere statements of probability or expectation, there is an insufficient legal basis for estopping OCS from complaining about Phibro's negligent misrepresentation. However, to the extent that OCS's group I points of error assert that a reversal of the estoppel findings should, in and of itself, result in a new trial or judgment *n.o.v.* in favor of OCS, they are overruled.

■ Phibro argues on appeal that the jury finding (No. 4) that OCS waived its right to complain that it was fraudulently induced amounts to a finding that OCS waived its negligent misrepresentation claim as well. We disagree.

Special Issue No. 1 submitted OCS's claim for fraudulent inducement. Special Issue No. 2 submitted OCS's claim for negligent misrepresentation. The jury answered "No" to each subpart of Special Issue No. 1, finding no fraudulent inducement. However, as we have noted, the jury answered "Yes" to three subparts of Special Issue No. 2, finding that Phibro had induced OCS to enter into the contract by making certain negligent misrepresentations.

The court submitted the following issue and instructions in Special Issue No. 4:

If you have answered any subdivision of Special Issue Nos. 1 or 2 "Yes," and only in that event, then answer Special Issue No. 4.

SPECIAL ISSUE NO. 4

Do you find from a preponderance of the evidence that OCS waived any right

to complain that it was fraudulently induced to enter into the contract?

Answer "Yes" or "No."

INSTRUCTION FOR SPECIAL ISSUE NO. 4

A person who claims he was fraudulently induced to enter into a contract waives his claim of fraud if he continues to accept benefits under the contract after he becomes aware of material facts concerning the fraud, or if he conducts himself in such a manner as to recognize the contract as binding. Waiver can also occur where the party claiming fraud enters into a new agreement, by which the rights of the parties are changed, after he becomes aware of material facts concerning the fraud.

The jury answered "Yes" to Special Issue No. 4, finding that OCS had waived its claim of "fraudulent inducement."

Because Special Issue No. 4 was predicated upon an affirmative answer to either Issue 1 or 2, and the jury answered "no" to each sub-part of the fraudulent inducement issue, Phibro argues that the jury's answer to Special Issue No. 4 was predicated upon the affirmative answers to the negligent misrepresentation issue. Phibro argues that, in answering Special Issue No. 4, the jury determined that OCS had waived its claim of negligent misrepresentation.

However, the words used in the issue and instruction address only "fraudulent inducement", and not "negligent misrepresentation". Regardless of the fact that the Issue 4 was improperly predicated upon the negligent misrepresentation issue, the issue and instruction were clearly and expressly limited to fraudulent inducement, and not negligent misrepresentation.

■ Because the wording of Issue 4 and the accompanying instruction limited the jury's consideration to the fraudulent inducement claim, the issue carved out the issue of waiver of fraudulent inducement from the broader issue of waiver of misrepresentation claims generally. Given the state of the charge and the totality of the trial proceedings, the jury could not have considered or determined the issue of waiver of negligent misrepresentation by refer-

ence to Issue 4 and the accompanying instruction. Thus, by affirmatively restricting Issue 4 to fraudulent inducement, Phibro failed to submit the defensive theory of waiver of negligent misrepresentation and thereby waived this ground of defense. We consider that *Island Recreational Development Corp. v. Rep. of Texas Savings Assoc.*, 710 S.W.2d 551 (Tex.1986) should be distinguished. In that case the trial court's submission on a single issue *without reference to* waiver was affirmed because the totality of the trial proceedings showed that, in answering the issue, the jury must have considered and determined the waiver issue.

■ We have sustained OCS's group I points of error only in so far as they attacked the legal sufficiency of the estoppel findings but have not held that they entitle OCS to a new trial or to a judgment *n.o.v.* Having now concluded that Phibro waived its defensive theory that OCS had waived its claim of negligent misrepresentation, we hold the trial court erred in entering judgment against OCS on its claim of negligent misrepresentation. Further, because the court failed to submit the damage and proximate cause issues requested by OCS on its claim of negligent misrepresentation, and there was evidence to support their submission, OCS's cause of action for negligent misrepresentation must be remanded for new trial. OCS's points of error 31 and 32 are sustained.

We now consider whether the errors of the trial court related to the estoppel issues require reversal of that portion of the judgment ordering that OCS take nothing by its breach of contract cause of action. Because OCS was, as a matter of law, not estopped from complaining about Phibro's failure to perform its contractual obligations, we next consider the effect of the remaining jury findings on OCS's contract claim and on Phibro's counter-claim.

The consignment agreement between Phibro and OCS was essentially a contract for the sale of goods, so the Uniform Commercial Code, Tex.Bus. & Comm.Code Secs. 1.101, et seq. (Vernon 1987), governs the

interpretation and enforcement of the contract. While the U.C.C. provides no remedy of "rescission", its application does in certain circumstances reach results indistinguishable from common law rescission. *See, e.g., Freeman Oldsmobile Mazda Co. v. Pinson,* 580 S.W.2d 112 (Tex.App.— Eastland 1979, writ ref'd n.r.e.) (buyer entitled to rescissionary remedies after acceptance where he establishes that he justifiably revoked acceptance of automobile because non-conformity substantially impaired its value to him); *Bill McDavid Oldsmobile, Inc. v. Mulcahy,* 533 S.W.2d 160 (Tex.App.—Houston [1st Dist.] 1976, no writ) is to the same effect.

A buyer's remedy of cancellation may arise either from circumstances of justifiable revocation of acceptance or of rightful rejection of goods. Tex.Bus. & Comm. Code Sec. 2.711 (Vernon 1987). He may cancel as to specific goods if he justifies his revocation of acceptance by proof that the non-conformity with regard to those goods substantially impaired their value to him (*Id.,* Sec. 2.608); his right to cancel as to specific goods which arises from his rightful rejection of the goods depends only upon the right to reject the goods because of non-conformity. *Id.,* Sec. 2.601. In either case, in order to cancel the entire contract the buyer must show that the breach extended to the whole contract (*Id.,* Sec. 2.711); i.e. that it substantially impaired the value of the contract as a whole. *Id.,* Sec. 2.612. This the jury found in response to Issue 6.

OCS claims that it conclusively established its right to cancellation of the entire contract under the Uniform Commercial Code because the jury found (in Issue No. 5) that Phibro failed to provide inventory which met API specifications, and (in Issue No. 6) that Phibro's failure to perform substantially impaired the value of the contract as a whole. OCS argues that the first finding established the existence of a non-conformity with regard to at least some of the pipe, entitling it to reject the entire inventory under Sec. 2.601 (the perfect tender rule) and that when it rejected the entire inventory upon cancellation, it "rightfully rejected" the goods in fulfill-

ment of the first prerequisite for cancellation of the entire contract. OCS also argues that it met the second prerequisite for cancellation of the entire contract under the U.C.C. because the jury, in finding substantial impairment, properly found that the breach extended to the whole contract under Secs. 2.711 and 2.612. OCS asserts that its cancellation of the contract because of Phibro's material breach discharged it from its executory obligations, including the payment of consignment and restocking fees. In addition, OCS says that under Sec. 2.711 it was entitled to recover consignment fees previously paid to Phibro.

Phibro claims that 1) it conclusively established its right to collection of the restocking fee because the jury found that OCS's rejection of the entire inventory was in bad faith, and 2) the bad faith finding precluded cancellation under the U.C.C. because, if OCS had not "rightfully rejected", it could not fulfill the first prerequisite to cancellation under the U.C.C.

Phibro claims in the alternative that the contract unambiguously provided that the restocking fee would be paid upon any termination by OCS and provided no right to "cancel." For both of these reasons, Phibro says that OCS's attempted cancellation amounted only to a termination of the contract requiring the payment of the restocking fee.

Phibro also argues that the contract provided for the payment of the restocking fee by OCS upon termination by Phibro in the event of a default by OCS and that OCS's default was established as a matter of law.

We address the legal and factual sufficiency of the evidence supporting the jury findings relevant to these claims.

In reviewing legal insufficiency points or "no evidence" points, we must consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences that may properly be drawn from that evidence and disregarding all contrary or conflicting evidence. *King v. Bauer; Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). A "no evidence" point must be

sustained if we find a complete absence of evidence of probative force or only a scintilla of evidence to support the finding, or if the evidence tending to support the finding must be disregarded because it is legally incompetent. If there is more than a scintilla of probative evidence to support the finding, the point must be overruled. *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 787 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960).

In reviewing factual insufficiency points, we must consider all of the evidence in the record that is relevant to the fact finding being challenged. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (Tex.1951). We must sustain a "factual insufficiency" point if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. *Texaco, Inc. v. Pennzoil Co.;* Calvert, 38 Tex.L.Rev. 361.

In cross-points, Phibro attacks the jury findings that it failed to perform its obligations and that this failure substantially impaired the value of the contract to OCS. The jury heard evidence that a substantial portion of the Phibro inventory did not comply with API specifications, and that this substantially impaired not only the value of the contract itself, but also OCS's future as a distributor in the oil country tubular goods marketplace. Although the credibility of the evidence was attacked throughout the trial by Phibro, the jury was free to believe the evidence presented by OCS.

■ A review of the record according to the standards of review appropriate to both factual and legal sufficiency supports the conclusion that the evidence supporting these findings 5 and 6 was both legally and factually sufficient. *Texaco, Inc. v. Pennzoil Co.*

OCS attacks the legal and factual sufficiency of the evidence supporting the jury finding, in response to Issue 7, that it acted in bad faith when it rejected the entire inventory on August 15, 1985.

The jury heard evidence that the declining prices in the oil market made the prices established in the consignment agreement highly unfavorable to OCS; further, that although OCS did not foresee such a result, its concession in the letter agreement allowing Phibro to sell from the threaded inventory at prices below the consignment prices created highly unfavorable competition for OCS, not only within the marketplace, but with regard to the same inventory. The jury heard evidence that indicated that even after August 15, 1985, OCS attempted to obtain the right to continue to sell from the inventory, notwithstanding the breach of warranty giving rise to its claims in this lawsuit, on the condition that Phibro not be allowed to compete against it.

In connection with Issue No. 7 (the bad faith issue) the jury was instructed that "a buyer who rejects goods acts in bad faith if he fails to act with honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." *See,* Tex.Bus. & Comm.Code Sec. 2.103(a)(2) (Vernon 1987).

■ Reviewing the record in the manner required by the appropriate standards of review, we conclude that there is both legally and factually sufficient evidence to support the jury's finding that OCS acted in bad faith when it rejected the entire inventory. *See, Printing Center of Texas, Inc. v. Supermind Publishing Co., Inc.*, 669 S.W.2d 779, 784 (Tex.App.—Houston [14th Dist.] 1984, no writ) (finding of bad faith rejection may be supported by circumstances which indicate that buyer's *motivation* in rejecting goods was to escape its bargain rather than to avoid acceptance of a tender which in some respect impaired the value of the bargain to him).

On the basis of the jury findings of Phibro's breach, and of substantial impairment, OCS was entitled to reject the entire inventory and to cancel the entire contract only *if it did so in good faith.* That is, if it did so with honesty in fact or in keeping with the observance of reasonable commercial standards of fair dealing in the trade.

For the purposes of Sec. 2.711, "rightful rejection" means rejection which satisfies both the perfect tender requirement of Sec. 2.601, *and* the buyer's general duty to act in good faith. *See*, Tex.Bus. & Comm.Code Sec. 1.203 (Vernon 1987); *Printing Center*.

Because there was evidence to support the finding that OCS failed to satisfy a necessary prerequisite to the availability of the rescissionary remedies it sought pursuant to 2.711, the trial court properly entered judgment that it take nothing against Phibro by way of its breach of contract claim.

On the other hand, we have held that there was legally and factually sufficient evidence supporting the jury findings, in response to Issues 5 and 6, that Phibro failed to perform its obligations and that this failure substantially impaired the value of the contract to OCS. By breaching the warranty of the inventory's condition in a manner which substantially impaired the value of the contract as a whole, Phibro committed a material breach. At that point, OCS was discharged from further executory obligations under the contract, including payment of the consignment fee then due and the restocking fee. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 689 (Tex.1981) (default by first party excuses performance by second; first party in default is not relieved by a subsequent breach by the second); *Jack v. State*, 694 S.W.2d 391, 398–99 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.) (it is fundamental that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from his obligation to perform); *Baker Marine Corp. v. Weatherby Engineering Co.*, 710 S.W.2d 690, 696 (Tex.App.—Corpus Christi 1986, no writ) (breaching party cannot take advantage of provisions favorable to it contained in the very contract which it was found to have breached).

■ Thus, regardless of OCS's inability to recover the remedies it sought under Sec. 2.711, and regardless of the construction or interpretation of the contract's right of "termination", Phibro was precluded from recovering on the contract because it

was in material breach. The fact that OCS acted in bad faith in rejecting the goods did not relieve Phibro of the consequences of its default and revive the enforceability of OCS's executory obligations. *Mead*, 615 S.W.2d at 689.

■ Further, we have seen that in answer to Issue No. 9, the jury did not find that OCS had waived its rights arising from Phibro's breach, and there is nothing in the record to indicate OCS otherwise affirmed the contract subsequent to Phibro's material breach. *Cf. Consolidated Engineering Co., Inc. v. Southern Steel Co.*, 699 S.W.2d 188, 191 (Tex.1985). Since Phibro has not attacked the jury's answer to Issue No. 9 by way of a cross-point, it has waived its right to complain of the jury's negative finding in that regard. Tex.R.Civ.P. 324(c); *See also, Clark v. Ingram*, 445 S.W.2d 780, 783 (Tex.App.—Dallas 1969, writ ref'd n.r.e.); *Associated Architects & Engineers, Inc. v. Lubbock Glass & Mirror Co.*, 422 S.W.2d 942, 946 (Tex.App.—Amarillo 1967, writ ref'd n.r.e.).

We hold that the trial court erred in entering judgment in favor of Phibro for the amount of the restocking fee, the amount of the consignment fee, prejudgment interest on those amounts, and attorney's fees.

■ Because Phibro's right to present the letter of credit depended upon a truthful statement that OCS had failed to pay the restocking fee when owed, Phibro could not properly present the letter of credit without destroying the legitimate purposes of the instrument. *Philipp Bros., Inc. v. Oil Country Specialists, Ltd.*, 709 S.W.2d at 264. The court therefore erred in lifting the injunction against the letter's presentment.

In so far as it orders that OCS take nothing against Phibro, the judgment is affirmed in part and reversed in part.

Because the court erred in failing to submit the appropriate damage issues related to OCS's claim for negligent misrepresentation, that portion of the judgment ordering that O.C.S. take nothing from Phibro on its

claim for negligent misrepresentation is reversed and remanded for new trial.

That portion of the judgment ordering that OCS take nothing from Phibro on its claim for breach of contract is affirmed.

The judgment in favor of Phibro is reversed, and judgment rendered that Phibro take nothing against OCS.

The cause is remanded to the trial court for (1) a new trial on OCS's cause of action for negligent misrepresentation; and (2) a determination of the amount collected by Phibro as a result of the presentment of the letter of credit, and entry of judgment in favor of OCS for that amount.