**Opinion issued April 30, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-13-00388-CV**

————————————

**NATIONAL OILWELL VARCO, L.P., Appellant**

**V.**

**FLOWSERVE CORPORATION, FLOWSERVE US INC., AND FLOWSERVE S. DE R.L. DE C.V., Appellees**

On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2010-76473

## MEMORANDUM OPINION

Flowserve Corporation, Flowserve US Inc., and Flowserve S. de R.L. de C.V. (collectively "Flowserve") sued National Oilwell Varco, L.P. ("NOV") for breach of contract and fraud after two motors that NOV sold to Flowserve for use in a client's water treatment plant leaked oil. Flowserve sought to recover from

NOV the money that it spent to acquire replacement motors. NOV contended that Flowserve rejected its motors not because they leaked oil, but because they were not designed to start on a lower voltage, which was a requirement that Flowserve's client initially failed to disclose to Flowserve or NOV. The jury returned a verdict in favor of Flowserve on both theories, and the trial court entered judgment on the jury's verdict for breach of contract. NOV appeals, arguing that the trial court erred in (1) refusing to submit instructions regarding NOV's defenses and (2) denying NOV's motions for new trial and judgment notwithstanding the verdict. We affirm.

## Background

### A. The Corbalis Water Treatment Plant expansion project

In 2002, the Fairfax County Water Authority in Herndon, Virginia, commenced an expansion project at its Corbalis Water Treatment Plant. The project was significant; the value of Fairfax's contract with its general contractor, Pizzagalli Construction Company, exceeded $160 million.

Among other things, the Corbalis project required the installation of two large pumps. Pizzagalli contracted with Flowserve to supply the pumps. Flowserve, in turn, contracted to purchase from NOV two vertical synchronous motors to drive the pumps. Fairfax provided the motor specifications, which

2

detailed the required design and provided that the bearing housing of the motors "shall be designed to prevent leakage of oil and excessive aeration of the oil."

## B.     Oil leakage and repairs

NOV concedes that the motors had "significant" oil leaks, shortly after they were delivered in the spring of 2009. Soon after the oil leaks were discovered, Fairfax issued a defective-work notice to Pizzagalli, indicating that the motors must be repaired to eliminate the leaks, and NOV was informed of the problem. The next month, Flowserve told NOV that it was concerned that its emails about the leaks were being "dramatically ignored," and requested "immediate input" regarding repairs. NOV responded, stating that it had not ignored the emails and had tried various unsuccessful remedies on site.

NOV engineers traveled to Virginia in June and July 2009 and attempted various fixes, but could not repair the leaks. They concluded that the motors would need to be removed for repair, but Fairfax could not release the motors during the peak-demand summer months, even though they continued to leak oil.

In December 2009, NOV informed Flowserve that it had decided to send the motors to Texas for repair, and that it would send a detailed repair schedule in a week. Flowserve responded that a week was too long when a schedule had been expected earlier. Flowserve also told NOV that Pizzagalli was refusing to pay a "tremendous amount of money" that it owed to Flowserve because the motor issue

had not yet been corrected. Flowserve noted that Pizzagalli thought that NOV was "unresponsive" and had supplied motors of "terrible quality," and was holding Flowserve accountable for NOV's deficiencies.

NOV prepared a schedule: the motors were to be removed one at a time, beginning in January 2010, and the repairs were to be completed by early April 2010. The repair proposal included the addition of a lip seal to keep oil inside the lower bearing housings.

The first motor was removed and arrived at NOV's facility in January 2010. As the repairs progressed, NOV decided not to install the proposed lip seal, telling Flowserve and Pizzagalli that it was unnecessary and would cause further delays. Pizzagalli asked Fairfax for approval to ship the motor back to Virginia, and Fairfax agreed, noting that it was "very disappointed and concerned" that the originally proposed repair procedures were not followed. Pizzagalli then authorized Flowserve to ship the motor, but reminded Flowserve that it bore all risks if the repairs were unsuccessful.

The motor was reinstalled at Corbalis in March 2010, but it showed signs of leaking the next day. Internally, NOV continued to attempt to find a way to resolve the oil leaks. But one engineer noted in an internal email that NOV was "looking very stupid in front of this customer!!" The NOV engineer responsible for the design of the motors' lower bearing housing reported internally that he

"suspect[ed] that if we do not get this [oil leak issue] turned around really fast . . . they might end up using our[] [motors] until they get someone else to build some[,] then tell us they don't want them . . . ."

On March 19, 2010, Fairfax inspected the repaired motor and was displeased to see that it was running hotter than it had previously and that there was a "remarkable amount of oil residue." Fairfax sent a letter to Pizzagalli, requesting an immediate plan of action, telling it that "[w]ith this ongoing oil leakage problem and new high bearing temperature problem we still consider this equipment defective," and stating that it was "very concerned" that the motors could not be repaired. Pizzagalli responded by notifying Flowserve: "due to the repeated and continuing problems . . . we will formally and finally reject the motors and require that Flowserve act immediately to provide new motors" unless certain repair conditions were met. In response, Flowserve and NOV prepared a written repair plan. Based on NOV's analysis, Flowserve informed Pizzagalli that the oil on the repaired motor was merely residual and proposed that the second motor be repaired as the first one had.

After the second motor was repaired, it was returned to Corbalis on Friday, May 21, 2010. Before it was started, a Fairfax inspector put his hand inside the motor and found that it came away "covered in oil." Pizzagalli immediately contacted NOV and Flowserve and requested that a representative from Flowserve

5

inspect the second motor. NOV responded that it had tested the motor for 36 hours with no leak and that it believed that the oil was merely residual. But it also admitted that the motors had been steam-cleaned and baked to remove any residual oil before they were shipped back to Corbalis.

On June 2, 2010, Pizzagalli formally rejected the two motors due to the "persistent and substantial oil leaks," which it noted had been ongoing since April 2009. Pizzagalli noted that "[t]he opportunity for Flowserve and NOV to cure the oil leak defect by repair of these motors is now long past," and it demanded that Flowserve agree in writing by June 11, 2010 to provide contractually-compliant motors manufactured by someone other than NOV.

On June 9, 2010, Flowserve demanded that NOV "provide Flowserve with a detailed proposal outlining the steps NOV will take to immediately and finally resolve the motor issues" by June 16, 2010. On June 10, 2010, Flowserve notified Pizzagalli that it had demanded that NOV provide a proposal for final resolution of the leaks, and that Flowserve was also evaluating alternative motor vendors. On June 11, 2010, NOV wrote Flowserve to propose several additional repairs, and concluded that, though they were "unsure of [the] origin" of the oil on the motors, the "tiny amounts" "if . . . indeed residual" should taper off to zero after four to six weeks.

On June 25, 2010, Flowserve told NOV that NOV's "inability to resolve the oil leak problem after several attempts over many months" left Flowserve with "little choice but to attempt to mitigate the damages caused by the . . . motors" by "sourcing replacement motors from a different motor supplier," and that NOV "is welcome to participate in this effort." Five days later, Flowserve notified NOV that Pizzagalli would not accept further repair attempts and that the motors would be replaced.

After Flowserve sued NOV, a June 2011 inspection of the motors revealed leaking oil. At trial, NOV engineers admitted that the oil was not residual and had leaked from the lower bearing housing.

## C.    The 65% requirement

Dominion Power, the utility company that supplied power to Corbalis, limited the voltage dip during startup of the pumps' motors to a maximum of 3% in order to avoid interruption of service to other customers. As part of the Corbalis expansion, Fairfax installed a reduced voltage starter set on a 65% tap, with the intention that the motors start on 65% power and transition to 100% power over time to avoid an impermissible voltage dip. But this design feature had not been included in the design specifications that NOV used to design the motors. Accordingly, through no fault of NOV, the motors it supplied were not designed to start on a 65% tap.

In August 2009, after NOV had concluded that the motors would need to be removed to repair the oil leaks, Flowserve learned for the first time that Fairfax wanted the motors to start on a 65% tap. Fairfax's engineering firm concluded that the motors supplied were not capable of starting on a 65% tap and would need to be modified or replaced in order to do so. Fairfax notified Pizzagali that the motors were defective because they were unable to start on a 65% tap.

Pizzagalli, in turn, notified Flowserve. Flowserve responded that it and NOV "were never contracted by Pizzagalli . . . to start at 65% rated voltage." Accordingly, Flowserve told Pizzagalli, "based on the fact that the 65% voltage start requirement is not a part of the contract between [Flowserve] and Pizzagalli, Flowserve and NOV will work . . . to meet this requirement, however, any changes to the pump or motor must be to the expenses of Pizzagalli." Pizzagalli disputed this, acknowledging that the requirement had not been included in the design specifications, but arguing that because it had been mentioned on associated drawings, the expenses should be covered by Flowserve.

Flowserve and Pizzagalli entered into a settlement agreement in July 2010. Pizzagalli agreed to pay Flowserve money that it was withholding on the Corbalis project and an unrelated project in exchange for Flowserve's replacement of the motors, which, according to the agreement, had been rejected due to oil leaks. The

replacement motors Flowserve purchased were designed to comply with the 65% requirement.

## D. Trial and post-trial motions

After a three week trial, the jury found that NOV breached its contract with Flowserve and committed fraud against Flowserve. The jury assessed $999,000 in damages for the amount paid by Flowserve for replacement motors attributable to NOV's breach, and $190,000 in incidental damages.

NOV moved for judgment notwithstanding the verdict, arguing that the evidence conclusively established that Flowserve rejected the motors because they did not meet the 65% requirement, not because they leaked, and that there was no evidence to support the jury's fraud finding. The trial court denied the motion and entered judgment on the jury's verdict for breach of contract and the parties' stipulation regarding attorney's fees.

NOV moved for a new trial, arguing, among other things, that the evidence showed as a matter of law that the oil leaks were not the cause of Flowserve's rejection of the motors, that the evidence was factually insufficient to support the jury's fraud finding, and that the trial court erred in denying its requested instructions regarding its defenses. The trial court denied the motion and NOV appealed.

9

## Charge Issues

In its first and second issues, NOV argues that the trial court erred in refusing to submit its requested jury instructions on NOV's affirmative defense of excuse. NOV argues that it was entitled to two such instructions: (1) a prior material breach instruction based on Flowserve's alleged bad faith refusal to provide NOV a reasonable opportunity to cure the oil leaks and (2) a waiver instruction based on Flowserve's alleged waiver of the right to sue NOV for NOV's delivery of non-conforming motors.

## A.    Standard of Review

We review a trial court's refusal to include an instruction in the jury charge for an abuse of discretion. *See Tex. Dep't of Hum. Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Powell Elec. Sys. v. Hewlett Packard Co.*, 356 S.W.3d 113, 122 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A trial court has wide discretion in submitting instructions and jury questions. *Powell Elec. Sys.*, 356 S.W.3d at 122. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Tex. Dep't of Hum. Servs.*, 802 S.W.2d at 649; *Powell Elec. Sys.*, 356 S.W.3d at 122.

A trial court must submit to the jury all questions, instructions, and definitions raised by the pleadings and evidence. TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions and definitions in the form provided by

10

Rule 277, which are raised by the written pleadings and the evidence."); *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). "When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable a jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam).

**B.     Did the trial court err in refusing to submit NOV's requested instruction regarding Flowserve's prior material breach?**

In its first issue, NOV contends that the trial court erred in refusing to submit its requested jury question on the affirmative defense of excuse based upon Flowserve's prior material breach of rejecting the motors in bad faith, without providing NOV a reasonable opportunity to cure the oil leaks.

**1.     Applicable Law**

A party is excused from performing a contract if the other party committed a prior material breach of the contract. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 852 (Tex. App.—Dallas 2005, pet. denied) (excuse based upon prior material breach is an affirmative defense). The

party asserting excuse bears the burden of proving it. *See Am. Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994).

Under the Uniform Commercial Code (UCC), which the parties agree is applicable here, each party to a contract has a duty to act in good faith in the performance or enforcement of the contract. TEX. BUS. & COM. CODE ANN. § 1.304 (West 2009); *El Paso Natural Gas Co. v. Minco Oil & Gas*, 8 S.W.3d 309 (Tex. 1999). "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing. TEX. BUS. & COM. CODE ANN. § 1.201(20) (West 2009). When a buyer rejects non-conforming goods and the time for performance has not yet expired, "the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery." TEX. BUS. & COM. CODE ANN. § 2.508 (West 2009).

## 2. Analysis

NOV argues that both the UCC and the parties' contract required Flowserve to provide NOV an opportunity to cure any nonconformity before Flowserve would be justified in replacing the motors. NOV further contends that Flowserve's failure to provide NOV a good faith, reasonable opportunity to cure amounts to a contractual breach that preceded any material breach by NOV. Accordingly, NOV maintains that the trial court should have submitted NOV's excuse defense based on prior material breach to the jury.

In its opening brief, NOV did not identify a provision of the contract that gave NOV the right to cure. It relied instead on the general UCC requirement that each party to a contract must reject goods in good faith. Later, in its reply brief, NOV asserted that the contract contained a cure and limitation of remedies provision:

> In the event any goods manufactured by [NOV] and furnished hereunder are found to be defective or otherwise fail to conform to the conditions of this contract, Buyer's sole and exclusive remedy shall be to notify [NOV] and [NOV] will at its option (1) replace the goods at the delivery point specified herein (2) repair the goods or (3) refund the purchase price. Buyer's remedies are limited as aforesaid regardless of the basis of the claim. Claims must be made promptly after discovery but not later than one year from date of delivery. [NOV] must be given an opportunity to investigate.

After oral argument, Flowserve filed a letter with this Court, asserting that the record contains competing purchase orders, and because of this "battle of the forms," the parties agreed that they would look solely to the UCC and not to the competing forms to supply the terms governing available remedies. We conclude that we need not decide the battle of the forms issue, or whether the parties agreed to look only to the provisions of the UCC, because neither of those questions impacts our analysis.

NOV tendered a proposed question on excuse with instructions regarding prior material breach and four other affirmative defenses. NOV's tender read:

*Affirmative defenses to breach of contract liability question and instructions—*

Was NOV's failure to comply excused?

You are instructed as follows:

Failure to comply by NOV is excused by Flowserve's previous failure to comply with a material obligation of the same agreement. In addition to the language of the agreement, the law imposes on a party to a contract a duty to enforce the contract in good faith. In that connection, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing. The duty of good faith applies to the buyer's decision to reject the goods.

Failure to comply by NOV is excused if compliance is waived by Flowserve.

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.

Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

NOV's failure to comply is excused if you find that Flowserve accepted the benefits of a transaction, and that Flowserve subsequently took an inconsistent position to avoid corresponding obligations or effects.

You are instructed that NOV's failure to comply is excused if you find that NOV's performance was rendered

14

> impracticable or impossible by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made.

> Answer "Yes" or "No":     _____

NOV's tender commingled instructions regarding six different affirmative defenses, but NOV argues in its first issue that the trial court erred in refusing the prior material breach instruction.

There is no evidence supporting an instruction regarding a prior material breach by Flowserve. It is undisputed that the motor specifications required that the bearing housing of the motors "be designed to prevent leakage of oil and excessive aeration of the oil." NOV's delivery of motors that leaked oil thus constituted a breach of the contract. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 203–04 (Tex. App.—Austin 1992, no writ.) (noting that failure of equipment to meet specifications warrants rejection and that trial court did not err in concluding that seller breached contract by failing to supply equipment meeting contract specifications). It is undisputed that Flowserve did not reject the motors and cover by buying new motors until *after* the oil leaks were discovered. NOV points to no evidence, and we have found none in the record, that would support a finding that Flowserve breached the contract before the leaks were discovered. Thus, there is no evidence that Flowserve's alleged breach occurred *before* NOV's—which is required, by definition, for Flowserve to

15

have committed a "*prior* material breach." *See Mustang Pipeline Co.*, 134 S.W.3d at 196.

At oral argument and in its briefing, NOV relied upon *Oil Country Specialists, Ltd. v. Phillipp Brothers Inc.*, 762 S.W.2d 170 (Tex. App.—Houston [1st Dist.] 1988, writ denied) and *Printing Center of Texas, Inc. v. Supermind Publishing Company, Inc.*, 669 S.W.2d 779 (Tex. App.—Houston [14th Dist.] 1984, no writ), to argue that the oil leaks could not constitute a breach of the contract until after NOV was given a reasonable opportunity to cure. According to NOV, this means that Flowserve breached first by refusing in bad faith to allow NOV reasonable opportunity to cure. However, neither *Oil Country Specialists* nor *Printing Center of Texas* supports NOV's position because neither involved the assertion of a prior material breach.

In *Oil Country Specialists*, the jury answered in the affirmative a special issue asking whether the plaintiff rejected the goods in bad faith. *See* 762 S.W.2d at 178–79. That is different from the theory asserted by NOV here, which is that the alleged bad-faith refusal to allow NOV to cure by repairing the non-conforming goods constituted the *first* breach. And while *Printing Center of Texas* recognizes that a buyer may reject goods in bad faith, *see* 669 S.W.2d at 784, it does not support the proposition that a bad-faith rejection of non-conforming goods can constitute the *first* breach of a contract so as to support a prior material breach

16

instruction, as NOV argues here. Thus, these cases do not support NOV's argument that the evidence here supports its requested prior material breach instruction. Because it was unsupported by the evidence, NOV's tendered instruction on prior material breach was not proper. *See Union Pac. R.R. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002).

In addition, the jury was instructed not to include in its damages award any amount that Flowserve could have avoided by the exercise of reasonable care. NOV argued that Flowserve did not act in a commercially reasonable manner when it rejected NOV's motors and chose to cover. Thus, the trial court's charge instructed the jury that Flowserve was not entitled to recover damages to the extent that Flowserve acted unreasonably. We hold that NOV failed to demonstrate that the trial court abused its discretion in rejecting its prior material breach instruction or that the rejection resulted in an improper verdict. *See Powell Elec. Sys.*, 356 S.W.3d at 122; *Shupe*, 192 S.W.3d at 579.

We overrule NOV's first issue.

**C.      Did the trial court err in refusing to submit NOV's requested instruction regarding excuse based on Flowserve's waiver?**

In its second issue, NOV contends that the trial court erred in refusing to submit its requested jury question on excuse based upon Flowserve's waiver of the right to recover for the damages it sustained in connection with its cover.

## 1. Applicable Law

Waiver may be asserted as an affirmative defense against a party who "intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right." *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *see also Robinson v. Robinson*, 961 S.W.2d 292, 300 (Tex. App.—Houston [1st Dist.] 1997, no writ) ("The doctrine of waiver distinguishes between a showing of intent to waive by actual renunciation and a showing of intent to waive based on inference."). When a party relies on inferred or implied waiver by conduct, it is that party's burden "to produce conclusive evidence that the opposite party manifested its intent to no longer assert its claim." *Robinson*, 961 S.W.2d at 300.

## 2. Analysis

NOV requested that the trial court submit the following instruction regarding excuse based upon waiver:

> Failure to comply by NOV is excused if compliance is waived by Flowserve. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

On appeal, NOV contends that Flowserve had the "right under the UCC to demand from Pizzagalli a reasonable opportunity" for NOV to repair or replace the motors. NOV contends that because Flowserve did not do so, and instead "chose to settle its differences with Pizzagalli in return for receiving Flowserve's withheld funds,"

18

it "waived its rights to demand" that NOV "pay for the replacement motors." NOV relies upon Section 2.711 of the Business and Commerce Code, which provides a buyer may "cover" at the seller's expense if the buyer rightfully rejects the goods. *See* TEX. BUS. & COM. CODE ANN. § 2.711 (West 2009). NOV argues that, because Flowserve did not "rightfully" reject the motors, it may not recover damages from NOV for the amount it spent "covering."

Because NOV relies on inferred or implied waiver by conduct, it was NOV's burden to adduce evidence that Flowserve manifested its intent to waive its claim against NOV for the cost of the cover. But NOV points to no evidence indicating such a waiver. *See Robinson*, 961 S.W.2d at 300.

The sole case NOV relies upon in support of its waiver argument, *Vera v. North Star Dodge Sales, Inc.*, 989 S.W.2d 13 (Tex. App.—San Antonio 1998, no pet.), illustrates the type of evidence required to support a claim of waiver. In *Vera*, after a dispute arose regarding North Star's sale of a car to Vera, North Star sent a check to Vera that said: "Endorsement releases North Star Dodge from any and all liability regarding the purchase of a 1993 Mazda Protg JM1B62266PO585288." *Id.* at 16. Vera endorsed and cashed the check, and waived his DTPA claim by doing so. *Id.* at 18.

There are no comparable facts here. Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming a

19

right, and NOV points to no statement or action by Flowserve suggesting that Flowserve did not intend to assert its right to have NOV compensate Flowserve for damages Flowserve sustained in connection with its cover. *See Tenneco, Inc.*, 925 S.W.2d at 643.

We overrule NOV's second issue.

## Judgment Notwithstanding the Verdict

In its third issue, NOV challenges the trial court's denial of its motion for judgment notwithstanding the verdict, contending that the evidence conclusively established that Flowserve rejected the motors because they did not meet the 65% requirement, and not because they leaked.

## A.    Standard of Review

We review the denial of a motion for judgment notwithstanding the verdict under a no-evidence standard. *See NETCO, Inc. v. Montemayor*, 352 S.W.3d 733, 738 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)). The evidence is sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence "in the light most favorable to the verdict," and we "credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Zachry Constr. Corp. v. Port of*

*Houston Auth. of Harris Cnty.*, 449 S.W.3d. 98, 101 n.3 (Tex. 2014); *Tanner*, 289 S.W.3d at 830 (quoting *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007)). Evidence is legally insufficient if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

## B. Applicable Law

To recover damages for breach of contract, a plaintiff must show that he suffered a pecuniary loss as a result of the breach. *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323–24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "Such losses must be the natural, probable, and foreseeable consequence of the defendant's conduct." *Id.* at 324 (citing *Mead v. Johnson Grp, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981)). "[T]he absence of a causal connection between the alleged breach and the damages sought will preclude recovery." *Id.*

## C. Analysis

The jury found that Flowserve was entitled to recover damages for NOV's breach of the contract. Viewing the evidence in the light most favorable to the

21

verdict, we conclude that the evidence at trial was legally sufficient to support the jury's verdict.

Flowserve's witnesses testified that Flowserve did not believe that either it or NOV was required by their respective contracts to supply motors designed to start on a 65% tap. They testified that irrespective of that requirement, the motors were unacceptable because they continued to leak, even after NOV's repeated attempts to fix them. Flowserve's General Manager testified that Flowserve's position was that it was not contractually required to supply motors that started on a 65% tap because that specification was not a part of the contract, but that it did have a contractual obligation to supply motors that did not leak oil, and that the motors were rejected and replaced because of the oil leaks. Documentary evidence showed that Flowserve informed Pizzagalli that neither it nor NOV was responsible for the expense of resolving the 65% tap problem because that requirement had not been included in the project specifications. This is some evidence supporting the jury's conclusion that Flowserve's damages were caused by the motors oil leaks as opposed to their failure to meet the 65% requirement.

NOV argues that the jury should not have believed Flowserve's witnesses because the evidence conclusively shows that the oil leaks were not the cause of Flowserve's damages. For example, NOV points to evidence that Flowserve's Post-Delivery Service Coordinator asked his manager whether they should have an

independent consultant, Armando Tovar, attend NOV's review of the motors when NOV was given an opportunity to propose a final resolution after Pizzagalli rejected the motors in June 2010. Flowserve's manager responded that he didn't "believe [Tovar] would . . . be of much help. The problem is more political than technical." NOV also points to evidence that Flowserve supplied replacement motors that could start on a 65% tap, arguing that this proves the 65% issue was the real reason that the motors were rejected.

We disagree with NOV's contention that this evidence conclusively showed that the motor leaks did not cause Flowserve's damages. The evidence on this point sharply conflicted; it was the province of the jury to resolve conflicting evidence, to determine the credibility of the witnesses, and to weigh their testimony. *City of Keller*, 168 S.W.3d at 819. We are required to credit evidence favoring the jury's conclusion that NOV's breach caused Flowserve's damages "if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Tanner*, 289 S.W.3d at 830. We conclude that there was more than a mere scintilla of evidence to enable reasonable and fair-minded people to conclude that the motors were rejected and replaced due to the oil leaks. *See City of Keller*, 168 S.W.3d at 827.

We overrule NOV's third issue.

Because we have determined that the trial court properly rendered judgment on the jury's breach of contract finding, we do not reach NOV's remaining issues, which pertain to the alternate ground of recovery, fraud.

## Conclusion

We affirm the judgment of the trial court.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.